**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 92-8442
Summary Calendar

HANSON J. BROUSSARD
RHONDA J. BROUSSARD,

Plaintiffs-Appellants,

VERSUS

UNITED STATES OF AMERICA,

Defendant-Appellee.

Appeal from the United States District Court
For the Western District of Texas
(W 91-CA-74)

March 24, 1993

Before KING, DAVIS and WIENER, Circuit Judges.

PER CURIAM:[*]

Hanson and Rhonda Broussard sued the United States under the
Federal Tort Claims Act (FTCA),[1] alleging that the death of their
son, Jermaine resulted from the negligent treatment that he

---

[*]Local Rule 47.5 provides: "The publication of opinions
that have no precedential value and merely decide particular
cases on the basis of well-settled principles of law imposes
needless expense on the public and burdens on the legal
profession." Pursuant to that Rule, the Court has determined
that this opinion should not be published.

[1] 28 U.S.C. §§ 2671-2680.

received at military hospital.  The district court granted partial summary judgment for the United States on the issue of FTCA liability for the action of an independent contractor physician.  After a full trial on the remaining issues the district court determined that Jermaine's injuries were so severe that nothing could have been done for him that would have saved his life, and granted judgment for the United States.  The court also held that the Broussards failed to prove that anyone other than the independent contractor physician was negligent.  Finding no error that warrants reversal, we affirm.

## I

### FACTS AND PROCEEDINGS

On June 22, 1989, three year old Jermaine Broussard was with his mother visiting friends at Fort Polk, Louisiana.  When Jermaine went to retrieve a toy from a neighbor's driveway, he was run over by the neighbor's vehicle.  The neighbor was a medic who immediately started CPR when he found that Jermaine did not have a pulse.  Jermaine was transported by ambulance to an Army hospital (the Hospital).  Before Jermaine arrived at the Hospital, his pulse was restored, lost, then restored again.  He had a pulse and was breathing on his own when he arrived at the emergency room.

The ambulance was met at the Hospital by an emergency room physician (the E.R. Physician).  He ordered a series of tests for Jermaine, but delayed some forty-five minutes before calling for a pediatrician and general surgeon.  The pediatrician arrived at

2

the Hospital twenty minutes after he was called. He diagnosed Jermaine as suffering from a closed head injury and ordered helicopter transport to another hospital that was better equipped for neurological support. But before he could be transported, Jermaine's condition worsened and he died.

Jermaine's cause of death was initially reported as closed head trauma. An autopsy was performed six days later on June 28, 1989. The autopsy report, which was issued the next day, revealed that Jermaine had suffered a torn thoracic aorta, and reported the cause of death as severe closed-chest injuries. The torn aorta had never been diagnosed by the Hospital emergency room personnel.

After exhausting their administrative remedies, the Broussards filed the instant suit on March 21, 1991, seventeen months after Jermaine's death. The complaint alleged that his death was caused by "various acts and omissions of negligence on the part of defendant's agents, servants, and employees." The United States was served on April 17, 1991 and filed its answer on June 17, 1991.

On December 23, 1991, the United States moved for summary judgment on the grounds that the Broussards apparently were relying solely on the acts of the E.R. Physician in this negligence action, but that he was an independent contractor, a class of actors that is excepted from the FTCA's waiver of sovereign immunity. This was the first time that the United States expressly claimed that the E.R. Physician was an

independent contractor for whose actions the United States was not liable. The original answer of the United States had only obliquely suggested such a claim when it stated: "Defendant denies any negligent act or omission on its part."

The United States supported its motion with a copy of the contract between the government and Emergency Medical Services Associates (EMSA). This contract provided that:

> It is expressly agreed and understood that the professional services rendered by the contractor are rendered in its capacity as an independent contractor. The Government retains no control over the professional aspects of the services rendered by the Contractor, including by example Contractors medical judgement [sic], diagnosis or specific medical treatment. Contractor shall be solely liable for any liability producing acts or omissions by it or its employees or agents.

The contract also required EMSA to carry liability insurance of not less than $1,000,000 per occurrence, and to indemnify the United States against all claims caused or contributed to by EMSA employees. The E.R. Physician was employed and paid by EMSA. The United States had no role in hiring him or in his direct supervision.

The district court granted partial summary judgment for the United States in so far as any negligence of the E.R. Physician was concerned, finding that he was an independent contractor. The district court refused to grant total summary judgment, however, concluding that a material fact issue existed whether the negligence of any non-independent contractor personnel at the Hospital may have caused Jermaine's death.

The case was tried to the court without a jury, and at the

4

conclusion of the trial the court rendered a judgment that the Broussards "take nothing."  In its Findings of Fact and Conclusions of Law, the district court denied the Broussards' motion to reconsider its previous grant of partial summary judgment.  The court also stated that it accepted the testimony of a defense expert witness that "Jermaine Broussard's injuries were so severe and extensive that nothing could have been done for him that would have saved his life," and that the Broussards "failed to prove by a preponderance of the evidence that anyone, other than [the E.R. Physician], committed any act of negligence in the care and treatment of Jermaine Broussard."  The Broussards timely appealed.

## II

### ANALYSIS

The Broussards assign four points of error in the instant appeal: 1) The government is responsible for the E.R. Physician's negligence; 2) the government is estopped from asserting the independent contractor defense; 3) plaintiffs have established a cause of action pursuant to Louisiana's Loss of Chance doctrine; and 4) other Hospital personnel were negligent in their treatment of Jermaine.  We discuss these issues seriatim.

A.    Independent Contractor Physician

"It is elementary that `[t]he United States, as sovereign, is immune from suits save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's

jurisdiction to entertain the suit.'"[2]  The United States has statutorily consented to suits pursuant to the terms of the Federal Tort Claims Act.[3]  This consent to be sued, though, does not extend to the acts of independent contractors.[4]

The Supreme Court has noted that Congress left the courts free to define the term "contractor."[5]  A critical factor in identifying a contractor "is the power of the Federal Government `to control the detailed physical performance of the contractor.'"[6]

The Broussards characterize the Supreme Court's test for independent contractor status as a "strict control" test, in which control over the detailed physical performance is the sole consideration.  They argue that the district court should not have relied on the strict control test:  As physicians have an ethical obligation of independence, they can never be subject to such a degree of control; therefore, under such a restrictive test they will almost always be found to be independent

---

[2] United States v. Mitchell, 445 U.S. 535, 538 (1980) (quoting United States v. Sherwood, 312 U.S. 584, 586 (1941)).

[3] 28 U.S.C. §§ 2671-2680.

[4] See 28 U.S.C. § 2671; United States v. Orleans, 425 U.S. 807 (1976); Logue v. United States, 412 U.S. 521 (1973).

[5] Logue, 412 U.S. at 528.

[6] Orleans, 425 U.S. at 814 (quoting Logue, 412 U.S. at 528); see also, Logue, 412 U.S. at 527 ("[T]he distinction between the servant or agent relationship and that of independent contractor turn[s] on the absence of authority in the principal to control the physical conduct of the contractor in performance of the contract.")

6

contractors.

The Broussards do not state what the test for an independent contractor physician should be, but they imply that it should be some form of modified control test. They rely on one case each from the Seventh and Tenth Circuits as suggesting the appropriateness of such a test.[7] But we do not read these cases as supporting the establishment of any radically different test for determining when professionals are independent contractors.

In Quilico v. Kaplan,[8] the plaintiffs sought to establish that the defendant physicians))who were temporary employees of the Veterans Administration))were independent contractors rather than employees who would be statutorily immune from personal liability. In order to establish that the physicians were independent contractors, the plaintiffs urged the court to follow the strict control test to determine the physicians' status. The Seventh Circuit acknowledged that under the strict control test, the physicians would not be employees, but neither would any other physician employed by the Veterans Administration regardless of the permanency or terms of their employment.[9] The Quilico court found that such a result would conflict with Congress's intent in statutorily providing immunity for physicians employed both permanently and temporarily by the

---

[7] Quilico v. Kaplan, 749 F.2d 480, 483-84 (7th Cir. 1984); Lurch v. United States, 719 F.2d 333, 337 (10th Cir. 1983), cert. denied, 466 U.S. 927 (1984).

[8] 749 F.2d 480 (7th Cir. 1984).

[9] Id. at 485.

7

Veterans Administration.[10]  The court consequently rejected the strict control test _for purposes of the determining the scope of immunity for Veterans Administration physicians_,[11] and instead relied on the relevant statutory definition of employees who were to be immunized from liability.[12]

In _Lurch v. United States_,[13] the Tenth Circuit questioned the use of a strict control test in determining whether a physician is an independent contractor.[14]  The plaintiff in _Lurch_ argued that the court should adopt a modified control test in which the "areas of medical service that are susceptible to supervision and control should be considered in determining if a physician is a federal employee."[15]  The _Lurch_ court found that it need not decide that issue, however, because the contractual arrangement and its application to the physician clearly established that he was not in an employer-employee relationship with the United States.[16]

---

[10] _Id._ at 487.

[11] _Id._ at 485.

[12] _Id._ at 487.

[13] 719 F.2d 333 (10th Cir. 1983), _cert._ _denied_, 466 U.S. 927 (1984).

[14] _Id._ at 337.

[15] _Id._ at 337.

[16] _Id._ at 337-38.  The facts of this aspect of _Lurch_ closely parallel those of the instant case.  Although the doctor in _Lurch_ worked in a Veterans Administration hospital, he was actually employed by a medical school which in turn contracted to provide physicians to the hospital.  The contract between the medical school and the hospital specified that: 1) The medical

8

Apart from the fact that the Seventh and Tenth Circuits have implicitly disapproved of a rigid control test for determining when a given professional is a government employee, we are not certain that such an inflexible test has ever been mandated by the Supreme Court.  As those two circuits (and the Broussards) have noted, if such an absolute strict control test were mandated, no professional who is required by a code of ethics to exercise professional judgment could ever be considered an employee of the United States for FTCA purposes.

We believe that a more significant observation is that, even though control of the detailed physical performance of the actor may be the most critical factor in identifying an employee, it is not necessarily the only factor.  "A critical element in distinguishing an agency from a contractor is the power of the Federal Government `to control the detailed physical performance of the contractor.'"[17]  In seeking to distinguish between an employee and an independent contractor, the Supreme Court in Logue v. United States[18] relied on § 2 of the Restatement

---

school had the discretion to choose the physicians to fulfill its obligations; 2) the parties stipulated that the physicians provided under the contract would not be considered VA employees for any purposes; and 3) the medical school assumed full responsibility for providing workmen's compensation, insurance and similar benefits for the physicians.  Id. at 338.

[17] Orleans, 425 U.S. at 814 (quoting Logue, 412 U.S. 521, 528) (emphasis added).

[18] 412 U.S. 521 (1973).

9

(Second) of Agency.[19]  That section defines an independent
contractor as "a person who contracts with another to do
something for him but who is not controlled by the other nor
subject to the other's right to control with respect to his
physical conduct in the performance of the undertaking."[20]  The
comments to this section expand on this definition: "Although for
brevity the definitions in this Section refer only to the control
or right to control the physical conduct of the servant, there
are many factors which are considered by the courts in defining
the relation."[21]

     We find the present situation to be analogous to that in
Lurch:  We need not define the outer limits of the test to
determine when a physician is an independent contractor because
"on the undisputed facts here, the contractual arrangement itself
and its application placed [the E.R. Physician] outside of the
parameters of an employer-employee relationship with the
Government."[22]  Unquestionably, the United States did not have a
traditional employer-employee relationship with him.  He was
neither hired nor paid by the United States.  Instead, the United
States had a contract with EMSA to provide the services of
physicians to staff the Hospital's emergency room.  Under the
terms of this contract, EMSA assumed full liability for the acts

---

[19] Id. at 527.

[20] Restatement (Second) of Agency § 2.

[21] Id. cmt. a.

[22] Lurch, 719 F.2d at 337-38.

10

or omissions of its employees, agreed to indemnify the United States against all claims caused or contributed to by its employees, and agreed to carry liability insurance for its employees.  The United States was only obligated to pay a contract price to EMSA; EMSA in turn was responsible for compensating the physician or physicians whose services it provided to the Hospital.  Even though the contract did not expressly obligate EMSA to control and supervise the physicians whose services it supplied, the agreement did specify that EMSA was to provide those professional services as an independent contractor and that the United States would retain no control over those professional services.  Under any reasonable test for distinguishing an employee from an independent contractor, EMSA would be defined as an independent contractor of the government and the E.R. Physician would be defined either as an employee of EMSA or its independent contractor.  Either way, he comes within the independent contractor exception to the FTCA's waiver of sovereign immunity so the United States cannot be held liable for his negligence.

B.    Estoppel

The Broussards next argue that the E.R. Physician's status as an independent contractor is an affirmative defense, and that the United States waived that affirmative defense when it did not plead it until after the prescriptive period (statute of limitations) for a negligence action against the doctor had run.

The government counters that under the FTCA independent

11

contractor status is not an affirmative defense but a fundamental jurisdictional defect that may be asserted at any time.  The government further insists that even if it were theoretically possible for the United States to be estopped from asserting the E.R. Physician's independent contractor status, the present facts would not support such an estoppel:  The United States did not engage in affirmative misconduct; and its failure to raise the independent contractor issue earlier did not prejudice the Broussards.

We again turn to the Supreme Court for guidance: "It is elementary that `[t]he United States, as sovereign, is immune from suits save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'"[23]  The United States has consented to suits pursuant to the terms of the Federal Tort Claims Act, but this consent is limited by those terms.[24]  "Where no such consent exists, a district court has no jurisdiction to entertain a suit against the United States."[25]  "[T]he District Court is vested with authority to inquire at any time whether the[] conditions [to the exercise of its jurisdiction] have been

---

[23] United States v. Mitchell, 445 U.S. 535, 538 (1980) (quoting United States v. Sherwood, 312 U.S. 584, 586 (1941)) (emphasis added).

[24] 28 U.S.C. §§ 2671-2680; Orleans, 425 U.S. at 813.

[25] Stanley v. Central Intelligence Agency, 639 F.2d 1146, 1156 (5th Cir. Unit B, March 1981).

12

met."[26]

As the government asserts, even if we were to assume for the sake of argument that the United States could be estopped from asserting a person's independent contractor status, such an estoppel would not lie in the instant case. At a minimum, the government would have to engage in affirmative misconduct before it could be estopped, and even then affirmative misconduct may not be sufficient.[27] The district court found that the government did not engage in affirmative misconduct, and we cannot state that this finding was clearly erroneous.

Additionally, the Broussards did not suffer any prejudice as a result of the timing of the government's assertion of the doctor's status. Jermaine died on June 22, 1989. The Broussards did not file the present suit against the United States until March 21, 1991, seventeen months after Jermaine's death. The Broussards' suit against the United States was based on negligence. The FTCA is subject to a two year statute of limitations.[28] The Broussards' suit was within this statute of limitations, but they would not have the benefit of the FTCA's comparatively generous statute of limitations if they had elected to sue the E.R. Physician personally for negligence.

Under Louisiana law, "[d]elictual actions are subject to a

---

[26] McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936) (emphasis added).

[27] I.N.S. v. Miranda, 459 U.S. 14 (1982).

[28] 28 U.S.C. § 2401.

13

liberative prescription of one year.  This prescription commences to run from the day injury or damage is sustained."[29] Consequently, any negligence action against the E.R. Physician had prescribed long before the Broussards filed their suit against the government.  Even if the government had pleaded that the doctor was an independent contractor the very day that the Broussards filed their complaint, their negligence cause of action against the E.R. Physician would have already been subject to a valid exception of prescription.

We note didactically that, as a general rule, whenever the United States has not waived its sovereign immunity, the district court should dismiss the complaint for want of subject matter jurisdiction rather than dismissing by granting a motion for summary judgment.[30]  This would allow the plaintiff an opportunity to amend his complaint so as to cure the jurisdictional defect, assuming he is able to do so.[31]  The district court here granted the government's motion for summary judgment (which was grounded in the government's lack of consent to be sued) to the extent that the Broussards sought to hold the government liable for the negligence of the E.R. Physician, but refused to grant summary judgment on the issue of any other person's alleged negligence.  Although the district court may have mislabeled its disposition of this motion, no reversible

---

[29] La. Civ. Code art. 3492.

[30] Stanley, 639 F.2d at 1159.

[31] Id. at 1159-60.

error was suffered as a result. The order neither disposed of the Broussards' entire cause of action nor barred them from amending their complaint (which in this case appears to have been unnecessary).

C.  Loss of Chance

The Louisiana Supreme Court has described that state's loss of chance doctrine as follows:

> The medical malpractice plaintiff does not have the unreasonable burden of proving that the patient would have lived if the defendant had not been negligent. However, the plaintiff does have the burden of establishing by a preponderance of the evidence that the defendant's conduct denied the patient a chance of survival.[32]

The Broussards complain that the district court erroneously found that "nothing could have been done for [Jermaine] that would have saved his life." In support of this argument, they cite the opinions of their two expert physician witnesses that Jermaine had a chance of survival if he had been properly diagnosed and treated.

The determination of whether the defendant's conduct denied the patient a chance of survival is a causation issue, and "[c]ausation is a question of fact."[33] "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to

---

[32] Smith v. Louisiana, 523 So. 2d 815, 822 (La. 1988) (second emphasis added); Hastings v. Baton Rouge General Hosp., 498 So. 2d 713 (La. 1986).

[33] Smith, 523 So. 2d at 822; see Urbach v. United States, 869 F.2d 829, 831 (5th Cir. 1989).

the opportunity of the trial court to judge the credibility of the witnesses."[34] Under the clearly erroneous standard, we may not reverse the district court's findings of fact unless the review of the relevant evidence leaves us with "the definite and firm conviction that a mistake has been committed."[35]

In its findings of fact, the district court stated: "The court accepts the testimony of Dr. William Dalsey that Jermaine Broussard's injuries were so severe and so extensive that nothing could have been done for him that would have saved his life." The district court made no mention of the contrary opinions of the Broussards' expert witnesses. Giving due regard for the opportunity of the district court to judge the credibility of the witnesses, we cannot say that the district court's finding on this fact issue is clearly erroneous.

D. <u>Other Hospital Personnel</u>

The Broussards attack the district court's finding that they "failed to prove by a preponderance of the evidence that anyone, other than [the E.R. Physician], committed any act of negligence in the care and treatment of Jermaine Broussard." Even if we were convinced that someone other than that doctor was negligent toward Jermaine, the Broussards cannot prevail in this negligence suit. Negligent conduct that does not cause injury is not

---

[34] Fed. R. Civ. P. 52(a); <u>Anderson v. Bessemer City</u>, 470 U.S. 564, 573 (1985).

[35] <u>United States v. United States Gypsum Co.</u>, 333 U.S. 364, 395 (1948).

actionable.[36]  The district court found unerringly that Jermaine would have died regardless of any course of treatment he might have received.  As the Broussards failed to establish causation))an essential element of their cause of action))we need not address the other elements of their negligence claim.

### III

### CONCLUSION

The United States is immune from suits except to the extant it consents to be sued.  The Federal Tort Claims Act is a statutory waiver of that immunity, but it is a limited waiver.  One express statutory limitation is the independent contractor exception.  As the E.R. Physician was an independent contractor, his conduct came within that exception to the FTCA's limited waiver of sovereign immunity.  Without the United States's consent to be sued, the district court was without jurisdiction to enter a judgment against it for the E.R. Physician's alleged negligence.  Accordingly, the district court properly refused to consider that aspect of the Broussards' claim.

The district court did not clearly err in finding that Jermaine would have died regardless of how competently he might have been diagnosed and how promptly he might have treated.  It follows inescapably then that negligence on the part of that physician or anyone else could not have caused the child's death.  As causation is an essential element of a negligence cause of

---

[36] See La. Civ. Code. art. 2315; Sibley v. Board of Supervisors, 477 So. 2d 1094, 1099 (La. 1985).

17

action, and as the Broussards have failed to establish any causation other than the fatal automobile injury, their negligence claim too must fail.  For the foregoing reasons, the district court's judgment for the United States is AFFIRMED.