**LIFE BANCSHARES, INC., et al.**

**v.**

**Jonathan FIECHTER, Acting Director, Office of Thrift Supervision.**

**Civ. A. No. 93–88–B.**

United States District Court,
M.D. Louisiana.

Nov. 3, 1993.

Etta Kay Hearn, Law Firm of Etta Kay Hearn, Ernest L. Johnson, Steven Young, I, Baton Rouge, LA, for Life Bancshares Inc., Rupert Richardson, Ernest Johnson and Gloria London.

John Joseph Gaupp, Dept. of Justice, Office of the U.S. Atty., Baton Rouge, LA, Dirk S. Roberts, Frances M. Recio, Office of Chief Counsel, Office of Thrift Supervision, Washington, DC, for Jonathan Fiechter.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

POLOZOLA, District Judge.

This matter is before the Court on defendant's motion for summary judgment. For reasons which follow, the Court finds that the motion should be granted.

### I. Facts and Procedural History

Life Savings Bank ("Life") was a minority-owned savings association located in Baton Rouge, Louisiana. Life was chartered in August, 1990, and was wholly owned by Life Bancshares, Inc., ("Bancshares").[1] The Office of Thrift Supervision ("OTS"), which was designated by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") as the primary regulator of savings associations, began its yearly examinations of Life in May, 1991.[2]

Following the first examination in 1991, OTS assigned Life a rating of four, which is a category reserved for institutions with an inadequate level of capital or a combination of other factors that are poor.[3] As a result of this poor rating, OTS required Life to execute a Supervisory Agreement with the OTS.[4] Primarily, the Supervisory Agreement placed restrictions on Life's lending practices. The agreement further required Life to adopt and implement lending and interest-rate risk policies and procedures, to comply with OTS regulations, and to retain

1. Administrative Record at 87.

2. Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183–553 (1989).

3. Administrative Record at 88.

4. Administrative Record at 88.

an independent accounting firm to study and evaluate Life's records.[5]

In March of 1992, OTS began another examination of Life. In its second examination, the OTS determined that Life had failed to meet two of three statutory capital requirements.[6] The OTS further found that Life's Board of Directors had not properly addressed the financial difficulties of the association. Following the examination, OTS prepared an examination report and provided a copy of the report to Life. A summary of the report, also prepared by the OTS, provided:

> The Institution is in poor financial condition due to the continued trend of operating losses and the future viability of the Institution is at question unless immediate action is taken to curb operating losses....
>
> The amount of capital remaining after various examination adjustments will reduce the capital level to a point that the Institution will fail to meet the Core and Risk–Based requirements by $171,000 and $118,000, respectively....
>
> Asset classifications total $338,000, a figure representing 6.70 percent of the total loan portfolio and 93.60 percent of adjusted tangible capital. The past due level is 11.7 percent. These unsatisfactory ratios are primarily due to the past poor lending practices related to commercial and consumer loans.[7]

In addition to Life's failure to comply with statutory capital requirements, OTS also identified 35 additional regulatory violations at Life.[8] As a result of this second examination, OTS assigned Life a rating of five, which is a category reserved for those institutions with an "extremely high immediate or near-term probability of failure" and for which "immediate corrective action and constant supervisory attention" is required.[9] OTS further notified Life that a Capital Directive would be issued and that Life was required to submit a Capital Plan acceptable to the OTS by July, 1992.[10]

On August 4, 1992, Life's board of directors executed a Stipulation and Consent to the Entry of a Capital Directive. The OTS issued a Capital Directive on the same day.[11] The Directive reaffirmed Life's obligation to submit a Capital Plan acceptable to the OTS. Furthermore, pursuant to the Directive, Life consented to the appointment of a conservator or receiver if, in fact, an acceptable plan was not timely and properly submitted.[12]

Life submitted a Capital Plan to the OTS. The OTS reviewed the plan and found it unacceptable because it lacked support for the proposed increases in capital, and because of numerous other deficiencies.[13] The OTS notified Life that its Capital Plan was unacceptable on August 25, 1992.

On October 5, 1992, following a consultation with the Louisiana State Commissioner, the regional director of the OTS drafted a Supervisory Memorandum to be forwarded to OTS officials in Washington. This memorandum reviewed in detail the history of Life

---

5. Administrative Record at 768–81.

6. The capital standards set forth in FIRREA have three components: (1) A leverage limit requiring core capital in an amount not less than three percent of the savings association's total assets; (2) a tangible capital requirement in an amount not less than 1.5 percent of the savings association's total assets, and; (3) A risk-based capital requirement which may not result in materially lower levels of capital being required of savings associations under the risk-based capital requirement than would be required under the risk-based capital standards applicable to national banks. See 12 U.S.C.A. § 1464(t) (West Supp. 1993).

7. Administrative Record at 100.

8. Administrative Record at 121.

9. Administrative Record at 101.

10. Administrative Record at 143–44. A Capital Directive is an order by the OTS directing an institution to comply with capital requirements and placing other restrictions on the operations of the institution. A Capital Plan is a plan submitted by the institution to the OTS specifically setting forth how capital will be replenished at the institution.

11. Administrative Record at 389–405.

12. Administrative Record at 398–99.

13. Administrative Record at 89.

and its financial condition. The memorandum further described the results of the 1992 examination of Life, and the failure of Life to comply with its regulatory capital requirements.[14] The regional director concluded that statutory grounds existed for the appointment of a receiver for Life, and recommended that a receiver be appointed.[15]

The regional director supplemented the Supervisory Memorandum on October 15, 1992. In this addendum to the October 5, 1992 memorandum, the director noted that the Federal Deposit Insurance Corporation ("FDIC") was considering terminating federal insurance for the depositors' accounts at Life. The director further stated that Life had incurred losses which had substantially depleted its capital, with no reasonable prospect for the institution to replenish capital without Federal assistance.[16] Although these additional factors militated in favor of receivership, the OTS did not appoint a receiver in order to review its own efforts to provide technical and educational assistance to Life.[17]

In November of 1992, Life submitted a second Capital Plan to the OTS. This plan called for the infusion of an additional $300,000 into the institution through the sale of stock or by a personal contribution of capital by Life's directors.[18] The OTS reviewed the plan and found it unacceptable. When it denied the plan, the OTS noted that a $300,000 infusion would be inadequate to increase the institution's capital to required levels. Furthermore, the proposed plan did not demonstrate: (1) that the market could support the sales of stock anticipated by Life, or (2) that the institution's directors had the financial ability to contribute $300,000.[19]

In a second supplement to the Supervisory Memorandum, the regional director advised Washington officials that Life's second Capital Plan was deficient, and would not be accepted.[20] Although statutory grounds existed for the appointment of a receiver, the transfer of Life to the RTC was again delayed to allow Life to consider and act upon a tentative proposal by Home Savings of America to acquire Life and a proposed infusion of capital by Life's directors.[21]

In November of 1992, FDIC bank examiners discovered serious discrepancies in Life's records, including a $481,349 discrepancy between Life's Federal Home Loan Bank account balance and its general ledger.[22] The FDIC then requested both OTS and state bank examiners to review Life's records and to help reconcile the inconsistencies.[23] After a thorough review of Life's records, numerous inconsistencies remained unexplained. An independent accounting firm which was hired by Life also concluded that Life's accounts were out of balance.[24]

The OTS notified Life on December 21, 1992, that it had been classified as a "critically undercapitalized" institution, and directed Life to submit an acceptable Capital Plan by January 15, 1993.[25] Life's board of directors failed to timely submit a Capital Plan by that date.

The FDIC, the OTS, and the state bank examiners concluded their examination of Life in January, 1993, and drafted a joint memorandum. The agencies determined that: (1) Life's cash account was overstated by $811,550 on the general ledger; (2) there were serious inconsistencies in Life's records; and, (3) entries in the general ledger were delinquent by at least 60 days.[26]

14. Administrative Record at 85–94.

15. Administrative Record at 85.

16. Administrative Record at 425–27.

17. Administrative Record at 638, 793–800.

18. Administrative Record at 1406–18, 1452.

19. Administrative Record at 1505–07.

20. Administrative Record at 497–500.

21. Administrative Record at 638–39.

22. Administrative Record at 3.

23. Administrative Record at 579.

24. Administrative Record at 564.

25. Administrative Record at 532, 537.

26. Administrative Record at 544–46.

On January 27, 1993, the Regional Director of the OTS affirmed his prior recommendation that Life be placed in receivership in a third supplement to the Supervisory Memorandum.[27] Thereafter, the Acting Chief Counsel of OTS then prepared a separate memorandum which reviewed the regional director's findings, and also recommended that Life be placed in receivership. The memoranda of the regional director and of the Acting Chief Counsel were made part of the administrative record, and were considered by Jonathan Fiechter, the Acting Director of the OTS ("Director"). After reviewing the administrative record, the Director determined that four separate grounds existed to appoint a receiver for Life.[28] Therefore, the Director appointed the RTC as receiver for Life on January 29, 1993.

This suit was then filed by Life Bancshares, Inc., Rupert Richardson, Ernest L Johnson, and Gloria London to remove the receiver who was appointed for Life. The Director has now filed a motion for summary judgment in which he contends: (1) plaintiffs have no standing to challenge the OTS's appointment of a receiver for Life, and (2) the determination by the OTS to appoint a receiver for Life was supported by the administrative record and was not arbitrary and capricious.

## II. Applicable Law and Standard of Review

The Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") gives the OTS additional authority to take action against poorly capitalized institutions.[29] In section 131 of FDICIA, Congress established the following capital categories for institutions: (1) well capitalized, (2) adequately capitalized, (3) undercapitalized, (4) significantly undercapitalized, and (5) critical-ly undercapitalized.[30] FDICIA further authorized the OTS to set regulatory capital standards for each of these five categories.[31]

Under FDICIA, if an institution is deemed critically undercapitalized, the OTS *must* appoint a receiver for the institution, unless the OTS determines that another action would better resolve the problems of the institution at the least possible long-term loss to the deposit insurance fund. Section 1831o(h)(3)(A) of Title 12 provides:

> The appropriate Federal banking agency shall, not later than 90 days after an insured depository institution becomes critically undercapitalized—
>
> (i) appoint a receiver ... for the institution; or
>
> (ii) take such other action as the agency determines, with the concurrence of the Corporation, would better achieve the purpose of the section, after documenting why the action would better achieve that purpose.[32]

In addition, the Director may appoint a receiver for a savings association if the Director determines that one or more of the grounds specified in 12 U.S.C.A. § 1821(c)(5) exists.[33] Because of amendments which became effective on December 20, 1992, there are now twelve grounds for the appointment of a receiver listed in section 1821(c)(5). In the present case, the Director found four of these grounds applicable to Life. The Director determined that a receiver should be appointed for Life for the following reasons: (1) Life was in an unsafe and unsound condition to transact business;[34] (2) Life had incurred or was likely to incur losses that would deplete all or substantially all of its capital, and there was no reasonable prospect for Life to become adequately capitalized

---

27. Administrative Record at 525–30.

28. Administrative Record at 11–12.

29. Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, 105 Stat. 2236 (1991).

30. 12 U.S.C.A. § 1831o(b)(1) (West Supp.1993).

31. 12 U.S.C.A. § 1831o(c)(2) (West Supp.1993).

32. 12 U.S.C.A. § 1831o(h)(3)(A) (West Supp. 1993); see also 12 U.S.C.A. § 1831o(a)(1) for the definition of "purpose" as referred to in § 1831o(h)(3)(A).

33. 12 U.S.C.A. §§ 1464(d)(2)(A)–(B) (West Supp. 1993).

34. 12 U.S.C.A. § 1821(c)(5)(C) (West Supp. 1993).

without Federal assistance;[35] (3) Life had consented to the appointment;[36] and (4) Life was critically undercapitalized or otherwise had substantially insufficient capital.[37]

■ The Director's decision to appoint a receiver for Life must be reviewed on the basis of the administrative record under an arbitrary and capricious standard of review. The Fifth Circuit set forth the standard which must be followed by the district court in *Woods v. Federal Home Loan Bank Board*.[38] In *Woods*, the plaintiff filed suit in federal district court seeking the removal of a receiver appointed by the Bank Board for a savings association.[39] After making a review of the administrative record, the district court granted the Bank Board's motion for summary judgment. In granting the summary judgment, the district court reviewed the defendant's appointment of a receiver under an arbitrary and capricious standard as set forth by the Administrative Procedure Act ("APA").[40]

The Fifth Circuit held that the trial court correctly applied the arbitrary and capricious standard of review.[41] At the time the Fifth Circuit decided the *Woods* case, the language of 12 U.S.C. § 1464(d)(6)(A) provided:

> The grounds for the appointment of a conservator or receiver for an association shall be one or more of the following:
>
>   *    *    *    *    *    *
>
> If, in the opinion of the Board, a ground for the appointment of a conservator or receiver as herein provided exists, the Board is authorized to appoint ex parte and without notice a conservator or receiver for the association. In the event of such

appointment, the association may, within thirty days thereafter, bring an action in the United States district court ... for an order requiring the Board to remove such conservator or receiver, and the court shall upon the merits dismiss such action or direct the Board to remove such conservator or receiver.[42]

After concluding that section 1464(d)(6)(A) did not set forth an applicable standard of review, the Fifth Circuit held that the Bank Board's decision should be reviewed on the basis of the administrative record in accordance with the APA's arbitrary and capricious standard of review.[43] Chief Judge Clark, writing for the Court, described the application of the arbitrary and capricious standard as follows:

> Under § 706(2)(A), plaintiffs have the burden to show that the Bank Board's decision to appoint a receiver was arbitrary and capricious. The Bank Board's decision is entitled to a 'presumption of regularity.' A court's review of the Bank Board's decision is 'confined to the administrative record.' The arbitrary and capricious standard of review requires a reviewing court to 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.'[44]

In order to create the OTS and the position as Director, Congress recently amended several sections of the Home Owners' Loan

---

**35.** 12 U.S.C.A. § 1821(c)(5)(G) (West Supp. 1993).

**36.** 12 U.S.C.A. § 1821(c)(5)(I) (West Supp.1993).

**37.** 12 U.S.C.A. § 1821(c)(5)(L) (West Supp.1993).

**38.** 826 F.2d 1400 (5th Cir.1987).

**39.** Under the statutory scheme in effect at the time of *Woods*, the Bank Board was charged with the administration of the Home Owners' Loan Act. 12 U.S.C.A. §§ 1461–1468 (West Supp. 1993). Congress created the OTS in 1989 and

transferred the enforcement power of the Bank Board to the OTS under FIRREA.

**40.** 5 U.S.C.A. §§ 701–706 (West 1977 & Supp. 1993).

**41.** *Woods*, 826 F.2d at 1403, 1408–09.

**42.** 12 U.S.C. § 1464(d)(6)(A) (1987), *amended by* 12 U.S.C.A. § 1464 (West Supp.1993).

**43.** *Woods* 826 F.2d at 1408.

**44.** *Woods*, 826 F.2d at 1408–09 (citations omitted).

Act, including § 1464(d)(6)(A) which was relied upon by the *Woods* court. However, much of the remaining substantive law of the Act was not changed. For example, language previously contained in 12 U.S.C. § 1464(d)(6)(A) is now contained in 12 U.S.C. §§ 1464(d)(2)(A) and (B) which provide:

**(A) Grounds for appointing conservator or receiver for insured savings association**

The Director ... may appoint a conservator or receiver for any insured savings association if the Director determines, in the Director's discretion, that 1 or more of the grounds specified in ... [12 U.S.C.A. § 1821(c)(5) ] exists.

**(B) Power of appointment; judicial review**

If, in the opinion of the Director, a ground for the appointment of a conservator or receiver for a savings association exists, the Director is authorized to appoint ex parte and without notice a conservator or receiver for the savings association. In the event of such appointment, the association may, within 30 days thereafter, bring an action in the United States district court ... for an order requiring the Director to remove such conservator or receiver, and the court shall upon the merits dismiss such action or direct the Director to remove such conservator or receiver.[45]

Therefore, the application of an arbitrary and capricious standard of review is supported by the language of both 12 U.S.C. § 1464(d)(6)(A), before its amendment, and the recently enacted 12 U.S.C.A. §§ 1464(d)(2)(A) and (B).

Both the prior and the amended versions of the statute provide that the decision to appoint a receiver for a savings association lies within the discretion of the specified governmental agency. Under the FIRREA amendments, this authority has now been conferred upon the Director. Compelling reasons exist for this grant of authority to the Director. A savings association's assets consist principally of depositors' funds. Assets can be quickly dissipated and liabilities may just as quickly be created. If there is inadequate capital to absorb losses, the losses must be initially absorbed by the FDIC, and then by taxpayers if these funds are depleted. In enacting the legislation, Congress made it clear that it expects the Director to be vigilant and responsive. FIRREA and its legislative history demonstrate that it is essential for the Director to act promptly in appointing a receiver once he finds that there is statutory authority to do so. The close supervision, broad discretion, and quick response mandated by FIRREA dictates a narrow and limited scope of judicial review that gives deference to the Director's judgment, knowledge and expertise.[46]

Because of the similarities between the present and prior versions of 12 U.S.C. § 1464, the Court finds that, under *Woods,* the Director's decision to appoint a receiver for Life is subject to review by this Court under an arbitrary and capricious standard. Furthermore, the Court's review of the Director's decision is confined to the administrative record.[47] The Court finds that its decision regarding the applicable standard and scope of review are consistent with FIRREA and its legislative history. Having determined the standard of review and what may be reviewed, the Court must now discuss the merits of defendant's motion for summary judgment.

## III. Discussion

### A. Congress' Limited Waiver of Sovereign Immunity

■ The Director first contends in his motion for summary judgment that the plaintiffs' action should be dismissed because Life is not a plaintiff in the present action. The Director relies on 12 U.S.C. § 1464(d)(2)(B),

---

**45.** 12 U.S.C.A. §§ 1464(d)(2)(A)–(B) (West Supp. 1993).

**46.** *Franklin Sav. Ass'n v. Director, Office of Thrift Supervision,* 934 F.2d 1127, 1137 (10th Cir. 1991).

**47.** *Woods,* 826 F.2d at 1409.

which provides that if the Director appoints a receiver for a savings association, "the *association* may, within 30 days thereafter, bring an action in the United States district court...."[48] Plaintiffs in the present action include the officers, directors, and principal shareholder of Life. However, Life was not joined as a plaintiff. Plaintiffs contend that section 1464(d)(2)(B) makes no sense if read literally because the association is no longer in existence following the appointment of a receiver. Therefore, plaintiffs argue that standing to bring this action should be conferred upon the present plaintiffs. Plaintiffs contentions are without merit and are contrary to the clear and explicit language of section 1464(d)(2)(B).

"It is elementary that '[t]he United States, as sovereign, is immune from suits save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.' "[49] The United States has statutorily consented to allow suits to be filed against the OTS pursuant to the terms of section 1464(d)(2)(B). The waiver of sovereign immunity provided by this section is explicit and limited. Congress has waived sovereign immunity to allow the *association* to bring an action requesting the removal of a receiver. Since section 1464(d)(2)(B) only confers standing upon the association and since the association is not a plaintiff in this action, the Court is without jurisdiction to hear the plaintiffs' suit.

The Sixth Circuit's opinion in *Marietta Franklin Securities. Co. v. Muldoon*[50] supports the Court's conclusion. In *Marietta*, the Sixth Circuit held that the association is "the entity authorized by Congress to seek review in the federal district court of the Director's conduct in appointing the receiver."[51] Because the savings association had not been made a party to the appeal, the court in *Marietta* concluded that it lacked jurisdiction and dismissed the appeal.

Therefore, the Court finds that Congress' explicit waiver of sovereign immunity in section 1464(d)(2)(B) authorizes the savings association to seek review of the Director's decision to appoint a receiver in a federal district court within 30 days after the appointment of the receiver. This authorization and waiver of sovereign immunity does not permit the association's directors, officers, or principal shareholders to file an action instead of the association. Since the association did not file this action, this suit must be dismissed pursuant to the clear and explicit language of section 1464(d)(2)(B).

**B.  Application of the Arbitrary and Capricious Standard to the Director's Decision to Appoint a Receiver**

■ Even if the Court determines that it has jurisdiction to entertain the plaintiffs' suit, the Court finds that based on a review of the administrative record, the Director's decision to appoint a receiver was not arbitrary and capricious. The Director based his decision to appoint a receiver for Life on four grounds. The Director first determined that Life was in an unsafe or unsound condition to transact business in violation of 12 U.S.C. § 1821(c)(5)(C). The Director reached this conclusion because Life did not have adequate books, records, or internal controls, and because Life failed to meet applicable capital requirements.[52]

The Court finds that the Director's determination that Life was in an unsafe or unsound condition to do business was not arbitrary or capricious. During the FDIC's examination of Life in November, 1992, bank examiners discovered serious discrepancies in Life's records, including a $481,349 discrepancy between Life's Federal Home Loan Bank account balance and its general ledger.

---

**48.**  12 U.S.C.A. § 1464(d)(2)(B) (West Supp.1993) (emphasis added).

**49.**  *Broussard v. United States*, 989 F.2d 171, 174 (5th Cir.1993) (quoting *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1352, 63 L.Ed.2d 607 (1980)); see also *Transohio Sav.*

*Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 606 (D.C.Cir.1992).

**50.**  972 F.2d 128 (6th Cir.1992).

**51.**  *Marietta*, 972 F.2d at 129.

**52.**  Administrative Record at 3–5, 11.

Plaintiffs contended that the overage should be recorded as additional capital. After consideration of the plaintiffs' request, the OTS concluded that the overage should not be treated as additional capital for two reasons: (1) the overstatement was due to faulty bookkeeping by Life; and (2) an actual shortage of cash existed at the institution. The Director further determined that Life's cash account was overstated by $811,550 on its general ledger, there were serious inconsistencies in Life's records, and that entries in the general ledger were at least 60 days delinquent. Even independent auditors hired by Life could not reconcile Life's books. In a letter to Life in November, 1992, the association's auditors stated that Life's internal controls "could result in more than a relatively low risk that errors or irregularities in amounts that would be material in relation to the financial statements may occur and not be detected within a timely period."[53] The Director also concluded that Life had failed to meet its statutory capital requirements.[54]

As a second ground for the appointment of a receiver for Life, the Director determined that Life's capital was depleted, and there was no reasonable prospect of the institution becoming adequately capitalized without Federal assistance.[55] This determination is clearly supported by the administrative record. Life incurred losses of over $1 million dollars for the first nine months of 1992.[56] These losses substantially depleted Life's leverage and risk-based capital. The administrative record further establishes that these losses were caused by Life's modest net interest margin, its high operating expenses, and management's failure to invest Life's excessive liquidity in higher earning assets.[57]

There was also no reasonable prospect of the replenishment of Life's capital without Federal assistance. The administrative rec-

ord demonstrates that, because of continuing losses, Life was unable to generate sufficient earnings to become adequately capitalized.[58] In fact, the OTS deferred its decision to appoint a receiver for Life for several months to allow Life an opportunity to increase its capital. However, Life was unable to find private sources of capital. Accordingly, the Director's decision to appoint a receiver for Life because of its inadequate capital levels in violation of 12 U.S.C. § 1821(c)(5)(G) was not arbitrary and capricious.

As a third basis for the appointment of a receiver for Life, the Director found that Life was a "critically undercapitalized" institution as defined in 12 U.S.C. § 1831o(b)(1).[59] The OTS classified Life as a critically undercapitalized institution in December, 1992, and notified Life of its decision.[60] Pursuant to 12 U.S.C. § 1821(c)(5)(L), the Director may appoint a receiver for a critically undercapitalized institution. Furthermore, under 1831o(h)(3)(A), the Director is required to appoint a receiver for a critically undercapitalized institution unless he determines that some other action would better solve the problems of the institution. Therefore, the Director was authorized under the law and facts of this case to appoint a receiver for Life.

Finally, the Director determined that Life consented to the appointment of a receiver pursuant to 12 U.S.C. § 1821(c)(5)(I). In August, 1992, Life, through its board of directors, executed a Stipulation and Consent to Entry of a Capital Directive with the OTS.[61] The Directive reaffirmed Life's obligation to submit a Capital Plan acceptable to the OTS. The Directive further provided that Life consented to the appointment of a receiver if, in fact, Life did not submit an acceptable Capital Plan before the prescribed deadline.

53. Administrative Record at 564.

54. Administrative Record at 4, 11, 89, 768–81.

55. See 12 U.S.C.A. § 1821(c)(5)(G) (West Supp. 1993).

56. Administrative Record at 5, 426.

57. Administrative Record at 5, 89.

58. Administrative Record at 5.

59. 12 U.S.C.A. § 1821(c)(5)(L) (West Supp.1993); see also Section II of this opinion.

60. Administrative Record at 532.

61. Administrative Record at 6, 389–405.

Although Life submitted two Capital Plans in 1992, neither of these plans was acceptable to the OTS. The OTS found the first Capital Plan unacceptable due to the lack of support for proposed increases in capital and numerous other deficiencies.[62] The second Capital Plan, submitted in November, 1992, was rejected by the OTS for two reasons. Primarily, the OTS found that the proposed $300,000 increase in capital would be inadequate to raise the institution's capital to required levels. Furthermore, the plan's proposed methods to acquire capital were not feasible. Pursuant to the express terms of the Directive, Life consented to the appointment of a receiver upon its failure to submit an acceptable Capital Plan to the OTS. Accordingly, the Director was authorized to appoint a receiver for Life under section 1821(c)(5)(I).

■ Plaintiff contends that genuine issues of fact exist in relation to several issues which preclude summary judgment as a matter of law. Plaintiff first cites section 308 of FIRREA, which provided:

The Secretary of the Treasury shall consult with the Director ... on methods for best achieving the following goals:

(1) Preserving the present number of minority depository institutions.

\* \* \* \* \* \*

(3) Providing technical assistance to prevent insolvency of institutions not now insolvent.

(4) Promoting and encouraging creation of new minority depository institutions.

(5) Providing for training, technical assistance, and educational programs.[63]

This section, which was to be codified at 12 U.S.C. § 1463, does not appear in the text of the statute. Instead, the section is contained within the "Historical and Statutory Notes" following the text of the statute in the 1993 pocket part.[64] Accordingly, section 308 is not

binding upon the Director or this Court. However, even if section 308 were applicable, it does not support the plaintiffs' contention that summary judgment is inappropriate.

Section 308 does not provide plaintiffs with any substantive rights or grounds for challenging the appointment of a receiver for Life. Instead, the provision sets forth goals to be attained by federal regulatory agencies. Furthermore, these goals were realized by the OTS. The OTS delayed the transfer of Life to a receiver on two separate occasions. The transfer to the RTC was originally scheduled for October 16, 1992, but was delayed to allow those involved to review the efforts made by the OTS to provide technical assistance to Life.[65] In December, 1992, the appointment of a receiver for Life was further delayed due to a tentative proposal by Home Savings of America to acquire Life and by a proposed infusion of $30,000 by Life's directors. Neither event occurred.[66]

■ Plaintiffs further contend that Life, as a state-chartered institution, is not a "savings association" under 12 U.S.C. § 1464(d)(2)(B). Therefore, plaintiffs argue that the Director's appointment of a receiver for the institution was improper. This contention is without merit. Section 1464(d)(5) defines a savings association as "any 2 savings association or former savings association that retains deposits insured by the Corporation, notwithstanding termination of its status as an institution insured by the Corporation."[67] This broad definition does not contain any exceptions for state-chartered savings associations. Instead, Congress specifically provided in section 1464(d)(5) that "any savings association" which retains FDIC-insured deposits constitutes a savings association for the purposes of section 1464(d)(2)(B). At the time of the appointment of the receiver, Life retained insured deposits and met

62. Administrative Record at 89.

63. Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 353 (codified at 12 U.S.C. § 1463nt (1993)).

64. See 12 U.S.C.A. § 1463 (West Supp.1993).

65. Administrative Record at 638, 793–800.

66. Administrative Record at 638–40.

67. 12 U.S.C.A. § 1464(d)(5) (West Supp.1993).

the statutory definition of a savings association.[68]

■ Plaintiff further contends that, pursuant to 12 U.S.C. § 1464(d)(2)(D), the Director is required to obtain the consent of the State Commissioner before appointing a receiver for a state-chartered institution. If such consent is not obtained, plaintiffs contend that the Director must delay the appointment of the receiver for 30 days. This contention is also without merit. The former section 1464(d)(2)(D) was repealed, effective December 19, 1992. The OTS appointed the RTC as receiver for Life on January 29, 1993. Under 12 U.S.C. § 1821(c)(9)(A), the OTS is only required to consult with the State Commissioner, and not obtain his consent, before appointing a receiver. In accordance with this section, the OTS did consult with the State Commissioner before appointing a receiver for Life.[69]

■ Finally, plaintiffs contend that the OTS was precluded from appointing a receiver for Life until February 2, 1993, because the OTS notified Life that the association would have until that date to file an acceptable Capital Plan. Plaintiffs base this contention on a November 23, 1992, letter from the OTS which stated that any institution which was not "adequately capitalized" would have until February 2, 1993, to file a Capital Plan.[70] However, the OTS classified Life as a "critically undercapitalized" institution on December 19, 1992. Life was notified that it would be classified as a "critically undercapitalized" institution on November 16, 1992.[71] The OTS further notified Life of its status as critically undercapitalized on December 21, 1992.[72] In its letter, dated December 21, 1992, the OTS advised Life that, as a critically undercapitalized institution, it must submit a Capital Plan to the OTS within 25 days after becoming critically undercapitalized.[73] Therefore, Life was required to submit a

Capital Plan by January 15, 1993. No such plan was submitted to the OTS. Considering the administrative record, this Court must conclude that the Director acted properly in appointing a receiver for Life.

## IV. Conclusion

The United States is immune from suits unless it consents to be sued. In order to challenge the appointment of a receiver, a savings association must comply with 12 U.S.C. § 1464(d)(2)(B). Life did not join as a plaintiff in the present action. Therefore, the Court does not have jurisdiction to entertain this suit.

Furthermore, even if the Court had jurisdiction, the Director's actions in appointing a receiver for Life were fully supported by the administrative record, and were not arbitrary and capricious.

Therefore:

IT IS ORDERED that the defendant's motion for summary judgment be and it is hereby GRANTED.

Judgment shall be entered dismissing plaintiffs' suit with prejudice.

---

**68.** See *Franklin Sav. Ass'n v. Director, Office of Thrift Supervision,* 934 F.2d 1127, 1133, 1150–51 (10th Cir.1991) (The Tenth Circuit held that appointment of a receiver for a state-chartered institution was not arbitrary and capricious and, therefore, dismissed action by the institution challenging the appointment).

**69.** Administrative Record at 87.

**70.** Administrative Record at 1505–07.

**71.** Administrative Record at 571–74.

**72.** Administrative Record at 532–33.

**73.** Administrative Record at 537.