Raiza BRAVO and Oscar Rodriguez, Individually and as natural parents and next friends of Kevin Bravo Rodriguez, a minor Plaintiffs,

v.

UNITED STATES of America, and Kenneth Kushner, M.D. Defendant

No. 04–21807.

United States District Court, S.D. Florida, Miami Division.

Nov. 30, 2005.

Ervin A. Gonzalez, Esq., Coral Gables, FL, for Plaintiffs.

Wendy A. Jacobus, Asst. U.S. Atty., Miami, FL, for Defendant United States of America.

Matthew L. Jones, Esq., Miami, FL, for Defendant Kenneth Kushner, M.D.

### FINDINGS OF FACT & CONCLUSIONS OF LAW

GONZALEZ, District Judge.

### JURISDICTION & PROCEDURAL HISTORY

1. Plaintiffs brought this action under the Federal Tort Claims Act ("FTCA") for personal injury arising out of the alleged negligent or wrongful acts or omissions of employees of the United States Government while acting within the course and scope of their employment under circumstances where the United States of America, if a private person, would be liable to the Plaintiff under the laws of the State of

Florida, where the acts or omissions occurred. 28 U.S.C. § 1346(b).

2. Plaintiffs satisfied the conditions precedent to bringing a lawsuit against the United States under the Federal Tort Claims Act, as set forth in 28 USC 2675 and 2401.

3. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b). Jurisdiction of this Court over Defendant United States is invoked pursuant to 28 U.S.C. § 2671, *et seq.*

4. Plaintiffs filed this action against the government for birth-related injuries arising out of the negligent medical care rendered to Plaintiff Raiza Bravo while she was in labor and delivery with her son, Kevin Bravo Rodriguez. Plaintiffs later amended their complaint to add a negligence count against Kenneth Kushner, M.D., individually, after the Government took the position that Dr. Kushner was an independent contractor for whom it was not responsible.

5. The day Plaintiffs amended their complaint to add Dr. Kushner, they filed a motion for summary judgment, asking the Court to find as a matter of law that Dr. Kushner was an employee of the United States Government for FTCA purposes at the time he rendered care to Raiza Bravo. Defendant United States filed a cross-motion for summary judgment, asking the Court to find as a matter of law that Dr. Kushner was an independent contractor when he rendered care to Raiza Bravo. Shortly thereafter, Defendant Kushner filed a motion a summary judgment asking the Court to find as a matter of law that Dr. Kushner was an employee of the United States Government for FTCA purposes at the time he rendered care to Raiza Bravo.

6. The Court referred the matter to a magistrate, who reviewed the pleadings and held oral argument on July 29, 2005. On August 16, 2005, Magistrate Judge O'Sullivan submitted a Report and Recommendation that the Court grant the motions for summary judgment of Plaintiffs and Dr. Kushner, find as a matter of law that Dr. Kushner was an employee of the United States Government for FTCA purposes at the time he rendered care to Raiza Bravo, dismiss the claims against Dr. Kushner individually, and deny Defendant United States' motion for summary judgment.

7. On September 26, 2005, the Court entered an order declining to follow the Report and Recommendation. Instead, the Court denied the motions for summary judgment of all parties, and determined that issues of material fact remained for trial as to the employee versus independent contractor status of Dr. Kushner during the relevant time period.

8. After the FTCA claim was filed, but before the law suit was initiated, Mr. Rodriguez filed for personal bankruptcy. His bankruptcy disclosure did not include his derivative claims for Kevin's injury. On September 2, 2005, Defendant United States moved to dismiss Mr. Rodriguez's claim for lack of standing based on his failure to disclose it during bankruptcy.

9. On September 19, 2005, Plaintiffs' counsel filed their response to the motion, and on October 6, 2005 moved to substitute the bankruptcy trustee as the real party in interest. On October 13, 2005, after oral argument on the matter at which the trustee was present, the Court granted the motion to substitute the trustee and denied Defendant United States' motion to dismiss.

## FACTUAL BACKGROUND

10. Plaintiff Oscar Rodriguez is a serviceman in the United States Navy.

11. His wife, Raiza Bravo, received her prenatal care at the OB Clinic–Mayport Naval Station in Jacksonville, Florida.

12. On June 5, 2003, Raiza Bravo had a normal non-stress test at the clinic. She was discharged home and advised to report on June 10, 2003 to the Naval Hospital of Jacksonville for a previously scheduled induction and delivery. She did as instructed.

13. The Naval hospital provided Raiza with medical personnel for her labor and delivery.

14. Ms. Bravo was in labor with Kevin throughout the day on June 10th, through the night, and also for part of the following day.

15. On the night shift, which consisted of the late afternoon on June 10th through the early morning hours on June 11th, the medical team provided to Raiza by Naval Hospital of Jacksonville consisted of an attending physician, Dr. Dwayne C. Clark; a resident physician, Dr. Ruben Del Pilar; and an obstetrical nurse, Ms. Quinlan.

16. On the day shift, which began around 7:00 to 7:30 on June 11th, the medical team provided to Raiza by Naval Hospital of Jacksonville consisted of an attending physician, Dr. Kushner; a resident physician, Dr. Jacqueline Fignar; and an obstetrical nurse, Ms. Jennifer Trzaskus. Dr. Fignar, the resident, had failed her last obstetrical rotation and, as a result, was in the midst of undergoing a remedial rotation.

17. Dr. Del Pilar, Dr. Clark, Dr. Fignar, Nurse Quinlan, and Nurse Trzaskus all were full-time Navy personnel. Dr. Kenneth Kushner, a civilian physician, also provided medical services to Ms. Bravo under a sub-contract with the United States.

18. At the time of induction, Ms. Bravo already was post-term.[1] Her labor was notable for slow cervical dilation, meconium when her water broke, and multiple decelerations that began in the early morning hours of June 11, 2003. Raiza developed a temperature at approximately 4:00 a.m. on June 11th. Her temperature had increased by 4:30 a.m., at which time the fetal heart tracing showed significant late decelerations. Late decelerations are an indication of utero-placental insufficiency.[2]

19. At 5:00 a.m., Dr. Del Pilar examined Ms. Bravo and suspected chorioamnionitis, which is an infection of the membranes that cover the fetus. He prescribed antibiotics but allowed labor to continue. As the morning progressed, Kevin's heart tracings show that he was suffering both late decelerations and also variable decelerations. Variable decelerations are caused by compression of the umbilical cord, which obstructs blood flow to the baby and thus reduces or even cuts off his oxygen supply. The heart tracings further show that Kevin's heart was losing beat-to-beat variability, which indicates he was becoming acidotic. Acidosis is a metabolic change in the tissue brought about as a response to oxygen deprivation in the tissues.

20. Acidosis in utero can be verified by two means. The first is an internal monitor known as a fetal scalp electrode. The hospital's protocols indicate Ms. Bravo had five of the seven indications for placement of the fetal scalp electrode and no contraindications for doing so. Dr. Scherger

---

1. Post-term babies are known to be at increased risk for utero-placental insufficiency and cord compression during labor.

2. Utero-placental insufficiency is a condition in which the placenta has become incapable of adequately perfusing, or oxygenating, the baby.

and Dr. Mahlmeister testified it was below standard care for both the night shift and day shift to have failed to place a fetal scalp electrode, and that such failure contributed to Kevin's outcome.

21. The second means by which fetal acidosis can be measured is by using a fetal scalp sampling kit to obtain the infant's pH status. When a scalp pH sample renders a pH of less than 7.2, acidosis is confirmed and the standard of care mandates immediate delivery. Two separate preprinted documents used by the hospital for Kevin's labor and delivery (Labor & Delivery Summary and the nursing flow sheet) provide a place to document the results of a scalp pH. Dr. Kushner testified he had requested fetal scalp sampling kits on numerous occasions during obstetrical meetings at the Navy Hospital before Raiza's labor, but one had never been provided. He testified that the standard of care required the hospital to make the fetal scalp sampling kit available and that failure to provide the kit was medical negligence by the hospital.

22. Nurse Quinlan transferred care to Nurse Trzaskus at around 7:00 a.m. on June 11, 2003.

23. The fetal heart tracings became progressively worse as the morning continued. By all accounts, during the time period between 8:00 a.m. and 11:50 a.m., Kevin's tracings went from those of a healthy baby, to those of a child who was in distress but salvageable, to those of a child who was significantly acidotic and ultimately born dead.[3]

24. Throughout the entire labor and delivery Kevin never fully descended in the birth canal and Raiza Bravo's cervix never fully dilated. Naval Hospital of Jacksonville policies and procedures instruct the medical staff to discourage pushing until the patient is fully dilated. Nonetheless, at 11:15 a.m., Raiza was ordered to begin pushing. Kevin's heart tracings immediately demonstrated signs that his heart was not tolerating the pushing. The pushing continued for over an hour with Nurse Trzaskus and the resident, Dr. Fignar, present.

25. Finally, at around 1:00 p.m., Nurse Trzaskus advised the resident that they needed to stop the pushing because of Kevin's heart tracing. The pushing was stopped, Dr. Kushner was summoned, and Dr. Kushner called a cesarean section to deliver Kevin because of recurrent, prolonged decelerations on his heart tracing. At approximately 1:20 p.m., while the operating room still was being prepared, Kevin's heart suffered a prolonged, severe deceleration from which it did not recover. His heart-rate was completely lost and a "crash-section" was called for terminal bradycardia.

26. Kevin was delivered by emergency cesarean section at approximately 1:35 p.m. on the afternoon of June 11, 2003. Thick meconium was again noted, which indicates Kevin had been in distress during the labor. Kevin was found to be in the left occiput transverse position, an indication that he had been stuck in the birth canal because of his head positioning. At the time of delivery, Dr. Kushner noted a tight nuchal cord wrapped around Kevin's neck, cutting off his oxygen. The cord was so tight around Kevin's neck that Dr.

---

3. The only dispute in this regard is that Plaintiffs' expert, Defendant Kushner's expert, and Defendant Kushner himself testified that the last clear chance for Kevin to be delivered healthy was at 8:00 a.m., Dr. Belfort, Defendant United States' expert testified that it was at 10:50 a.m. They all agreed that as the morning progressed, Kevin's tracings showed a child becoming increasingly acidotic, which is evidence of injury, and that by the time he ultimately was delivered, the acidosis had rendered him clinically dead.

Kushner had to clamp the cord to be able to cut it and release it.

27. Kevin was born cyanotic, with no heart rate, no respirations, no muscle tone, and no muscle reflex. The pediatrician who attended the cesarean delivery assessed Kevin using the Apgar scores method. Out of a possible 10, Kevin scored a 0. Two pediatricians attempted to resuscitate Kevin and continued assessing his Apgar score for 15 minutes. Kevin remained with zero Apgar scores at 5 minutes of life and at 10 minutes of life. At 13 minutes of life, the steroids he had been given to induce a heart rate succeeded and Kevin's heart began to beat. His Apgar score became 2 out of a possible 10, as he remained cyanotic, unable to breathe, and without muscle tone or reflex.

28. Kevin's blood gases, taken minutes after birth, established a pH level of 6.89. A normal pH level is 7.2 or higher. Kevin's base excess level was −17.9. A normal base excess is between −3 and +3. The experts for Plaintiffs and Defendants agreed that these lab results indicate Kevin suffered significant metabolic acidosis that developed because of ongoing oxygen deprivation during labor and delivery.

29. Approximately one hour after delivery Kevin was transferred to Shands Jacksonville, the closest hospital with a neonatal intensive care unit. Kevin was diagnosed with "hypoxic ischemic encephalopathy," a condition in which the brain is damaged due to lack of oxygen and blood flow.

30. After approximately four weeks, Kevin was discharged to Miami Children's Hospital so that his parents could benefit from the support of family in Miami.

31. Kevin remains under the care of numerous physicians and therapists at Miami Children's Hospital. At 29 months, he has the developmental stage of a 0–1 month old child. He does not suck, swallow, eat, speak, see, hear, roll, sit, or respond to any stimuli except pain. Kevin does not know his own mother. Kevin has severe spasticity, which causes his muscles to contract and become frozen. His leg was broken during a therapy session because the muscles are so rigid. When Kevin's body is moved, he cries in pain because his muscles are contracted and frozen.

32. Kevin's treating physicians at Miami Children's Hospital testified that Kevin requires full-time, around-the-clock care and will for the remainder of his life. He will also require numerous surgeries, therapies, and medications throughout his life.

33. Kevin's treating physicians testified within a reasonable degree of medical probability that Kevin will live to be at least 21 years of age although Dr. Oscar Papazian, a pediatric neurologist, plus Dr. Michael Tidwell, a pediatric orthopedist, and defense expert Dr. Ronald Cranford, a neurologist, testified that he could live many more years thereafter.

34. At trial, Dr. Kushner admitted that both he and the doctors who managed the shift before him failed to meet the required standard of care by failing to call for a cesarean section by at least 7:30 a.m. He testified that all indications for cesarean section were present as of 5:00 a.m., and that it was below standard care for the prior shift to fail to so advise him at 5:00 a.m. up through the time he physically arrived at the hospital for his shift around 7:30 a.m.

35. Dr. Joseph Scherger, Plaintiffs' expert, agreed it was below the standard of care to fail to call a cesarean section by 7:30 a.m. at the latest. He further testified that it was "egregious malpractice" to fail to deliver Kevin by 7:30 a.m. based on the clinical data and fetal heart tracings.

36. Dr. Kushner's expert obstetrician, Dr. Donald Westra, conceded on cross-examination by Plaintiffs' counsel that the cesarean section should have been called by approximately 5:00 a.m. when the presence of variable decelerations, late decelerations, and chorioamnionitis were noted in the chart. He believed, however, sufficient indications to deliver had been present since the afternoon of June 10th.

37. Dr. Kushner further testified that had Kevin been delivered by 8:00 a.m., he would have been normal. Both Dr. Scherger and Dr. Westra agreed.

38. The United States' obstetrical expert, Dr. Michael Belfort, agreed that Raiza Bravo had become a high risk patient as of 5:00 a.m. because she was (a) post-dates, (b) had meconium on rupture of membranes that worsened throughout the labor, and (c) developed a fever after prolonged rupture of membranes which led the physicians to suspect and treat for chorioamnionitis. Dr. Belfort further agreed it was below the standard of care to delay delivery Kevin's delivery based on his heart tracings by mid-morning on June 11, 2003.[4] He also agreed that if Kevin had been delivered by 8:00 a.m., or even as late as 10:00 a.m., in his opinion, Kevin would have been normal. Dr. Belfort testified that the fetal tracings indicate the damage to Kevin occurred after 10:00 a.m. on June 11, 2003.

39. The United States argued two points in its defense. First, the United States argued the malpractice was committed exclusively by Dr. Kushner, a civilian for whom it was not responsible, hence neither Dr. Fignar nor Nurse Trzaskus could be held accountable for the course of labor or outcome because the ultimate decisions rested with Dr. Kushner.

40. The hospital's internal documents, however, establish a Chain of Command that these health care personnel were required to follow to have other nurses, physicians, and/or department heads assist them if they disagreed with the medical decisions of the attending physician. Neither Dr. Fignar nor Nurse Trzaskus ever invoked the available Chain of Command during the labor and delivery of Kevin Bravo Rodriguez. These same hospital protocols further establish that the nurse is a professional who is responsible for reading and understanding fetal heart tracings as well as notifying physicians promptly of any abnormalities in the tracings or with the patient. These protocols speak in great detail about the dangers to the child if nonreassuring heart tracings are not brought to the attention of the physician and interventions begun. The hospital policies state that nurses will be held to the standards of care set by their profession.

41. Under prevailing Florida law, a violation of the hospital's own internal policies may be considered evidence of negligence. *Marks v. Mandel,* 477 So.2d 1036 (Fla. 3d DCA 1985) and cases cited therein; *see also Metropolitan Dade County v. Zapata,* 601 So.2d 239 (Fla. 3d DCA 1992).

42. Plaintiffs' nursing expert, Dr. Laura Mahlmeister, and their family practice expert, Dr. Joseph Scherger, both testified within their respective areas that the standard of care required the nurse and the family practice resident to go up the chain of command in light of the available medical information that Kevin was in jeopardy. The failure of Dr. Fignar and Ms. Trzaskus to do so constituted a deviation from the standard of care and contributed to the

---

4. Dr. Belfort testified that the standard of care did not require cesarean delivery until 10:50 a.m. on June 11th, although he personally would have performed a cesarean to deliver Kevin by 10:00 a.m.

delay in delivering Kevin. The Court agrees with their testimony, and notes that it is consistent with the hospital's own written protocols and guidelines.

43. Plaintiffs' expert pediatric neurologist, Dr. Bernard Maria, a Professor of Pediatrics and Neurosciences at the Medical University of South Carolina in Charleston, holds the Jeffrey Edwin Gilliam Chair for Neurodevelopment. He testified that the asphyxiation, oxygen deprivation and lack of blood flow to Kevin during labor caused him to be born with hypoxic ischemic encephalopathy, as evidenced by Kevin's lack of heart rate, lack of respiratory action, and lack of movement at birth. The hypoxic ischemic encephalopathy resulted in the severe, permanent neurological damage that Kevin suffers. Dr. Maria further testified that the neurological insults to Kevin, caused by oxygen deprivation and blood flow injury, occurred sometime during the six-hour time period preceding birth, and culminated in severe and irreversible damage by the time Kevin was delivered.

44. Dr. Maria also testified that the clinical evidence, specifically including Kevin's normal head circumference at birth, indicates that Kevin had not suffered a severe brain injury before labor and delivery. The clinical evidence, including the length of time during which Kevin's Apgars remained at zero, his development of seizures shortly after birth, the global nature of the brain injury shown on the CT scan and EEG, the cardiomyopathy at birth, and the systemic damage to all vital organs further indicates that the hypoxic ischemic encephalopathy was acute in labor and probably sustained over many minutes to hours.

45. Dr. Maria also testified that although Kevin has a reduced life expectancy based upon his injuries, nevertheless that with proper medical and therapeutic care he is expected to live up to 20 years from birth given technological developments in health care. As noted, Kevin's actual treating physicians, Dr. Papazian and Dr. Tidwell, testified that Kevin will live to be at least twenty-one years of age and may live much longer.

46. As its second point of defense, the United States argued that Kevin's condition predated his admission to the hospital. The United States argued that pathological analysis of the umbilical cord and placenta showed infection had been present for days before delivery; however, its own expert pathologist, Dr. Raymond Redline, testified that the pathology findings established within a reasonable degree of medical probability that Kevin had not suffered any injury from the infection in the placenta or cord. Dr. Redline further testified that Kevin was born without any signs of infection, but Kevin had suffered "significant cord occlusion" during the intrapartum period, which he defined as being "during labor and delivery."

47. In further support of its second defense, the United States presented testimony by Dr. Elias Chalhub, a pediatric neurologist. Dr. Chalhub disagreed with the uniform consensus of all the clinicians in the case—Dr. Kushner, Dr. Westra, Dr. Scherger, Dr. Belfort, Dr. Papazian (a treating physician) and Dr. Maria—that Kevin's neurological injury had occurred sometime during the final hours of Kevin's labor and delivery,[5]

---

5. All of these witnesses testified that had Kevin been delivered by 7:30 to 8:00 a.m., he would have been normal. The Court notes that one witness was a party defendant, two witnesses were hired by Defendants, two witnesses were hired by Plaintiffs, and one witness was Plaintiffs' treating physician at Miami Children's Hospital who owed no allegiance to either side. Dr. Chalhub stands alone.

48. To put it as kindly as possible, the Court finds that Dr. Chalhub's testimony was not only unreasonable, but indeed incredible for reasons too numerous to mention. One example will suffice. Dr. Chalhub testified that fetal heart tracings are meaningless and provide no information on the status of the fetus except to indicate in utero fetal demise. Why the fetal heartbeat which is universally and routinely monitored when of no value, Dr. Chalhub failed to explain.

49. The Court finds that the medical evidence and testimony establishes that Dr. Clark, Dr. Del Pilar, Dr. Kushner, Dr. Fignar, and Nurse Trzaskus failed to meet the acceptable standard of care during Raiza Bravo's labor and delivery of her son, Kevin all of which substantially contributed to Kevin's damages.

50. The Court further finds that but for this conduct the damage complained of would not have occurred.

51. On the matter of economic damages, Mr. Lawrence Foreman presented a lifecare plan that had been approved by Plaintiffs' treating physicians. Defendant Kushner's neurology expert, Dr. Cranford, testified that the treating physicians were in the best position to recommend medical and therapeutic interventions for Kevin. He also testified that many items included in the plan, even if he did not believe they would benefit Kevin, would nonetheless benefit his family and were reasonable expenditures based on the "devastating" impact Kevin's injury had on the family.[6] The Court agrees and therefore adopts the majority of the recommendations in Mr. Foreman's lifecare plan.

52. Plaintiffs presented testimony by Dr. David Williams, an economist, who performed economic calculations based on Mr. Foreman's report. The Court found Dr. Williams to be credible and adopts his report and many of his calculations.

53. Defendant United States presented testimony by Dr. Kenneth Clarkson, an economist, whose report the Court finds flawed and inaccurate in many respects. For example, he relied on government data which the government openly disclaims in writing on its website as being unreliable for the very purpose for which Dr. Clarkson used it. He underestimated the 2005 inflation rate by more than 50 percent (estimated 2 percent v. the actual 5 percent) even though the Consumer Price Index information providing the correct numbers was readily available. He also failed to deduct appropriate exemptions on Kevin's projected income, which were necessary to reach the accurate tax rate. Because of this failure, he calculated a markedly incorrect tax rate that was more than triple what the actual tax rate should have been, blaming the error on his "Turbo Tax" computer program. As a result, his calculation on this point was wrong—by more than 300 percent.

54. The specifics of the economic damages award is set out below in the Court's discussion at Section IV Damages.

### DR. KUSHNER WAS AN EMPLOYEE OF THE UNITED STATES GOVERNMENT FOR PURPOSES OF FEDERAL TORT CLAIMS ACT LIABILITY

55. The Court finds that any discussion of Dr. Kushner's status under the Federal

---

**6.** Two such therapies were hippotherapy and aquatic therapy, which Dr. Cranford believed would not provide a direct medical benefit to Kevin, but would provide important supportive care to his family. The Court notes that Kevin's treating orthopedic surgeon, Dr. Tidwell, testified that both hippotherapy and aquatic therapy were medically indicated for Kevin. Under either analysis, the Court finds these therapies to be appropriate.

Tort Claims Act is merely academic, as numerous military healthcare personnel also fell below the standard of care, which caused or substantially contributed to causing Kevin's injury. These healthcare personnel include Dr. Clark, Dr. Del Pilar, Dr. Fignar and Nurse Trzaskus. The below standard care provided by these military personnel all joined with the below standard care provided by Dr. Kushner to create one indivisible injury to Kevin. The Court finds that it cannot separate out or distinguish percentages or degrees of fault among the healthcare personnel.

56. For these reasons, the Court finds that it is unnecessary to determine whether Dr. Kushner was an employee of the government for purposes of Federal Tort Claims Act liability. Nonetheless, the issue having been raised, the Court sets forth the facts that lead this Court to conclude that Dr. Kushner in fact was an *employee* of the United States government for purposes of Federal Tort Claims Act liability at the time he rendered medical care to Raiza Bravo during her labor and delivery of Kevin Rodriguez.

57. Dr. Kushner, a civilian physician, provided obstetrical services to Raiza Bravo at the Naval Hospital of Jacksonville pursuant to a sub-contract for such services.

58. In 1996, the United States Department of Defense ("DOD") entered into a contract with Humana Military Healthcare Services ("Humana") known as the TRICARE contract for the southeast region. In the TRICARE agreement, Humana agreed to provide healthcare services to eligible military personnel and their dependents through a network of doctors and services. Under the TRICARE contract, Humana was a contractor to the government.

59. The TRICARE contract allowed for treatment facilities, such as the Naval Hospital of Jacksonville, to enter into their own agreements with the contractor, Humana, which are known as Resource Sharing Agreements. The Resource Sharing Agreements were subject to the provisions of the TRICARE contract.

60. Pursuant to the TRICARE contract, in 1998, the Naval Hospital entered into a Resource Sharing Agreement with Humana, in which Humana agreed to provide medical personnel including physicians, physician assistants, registered nurses, and nurse practitioners, to provide healthcare services to eligible military personnel and their dependents at the Naval Hospital.

61. The Naval Hospital provided Humana with an OB/GYN physician, Naval Hospital Jacksonville, Statement of Work ("Statement of Work"), which is attached and incorporated into the 1998 Resource Sharing Agreement.[7] The Statement of Work provides in pertinent part:

> ... The contractor OB/GYN physician activities shall be subject to day-to-day direction by Navy personnel in a manner comparable to the direction over Navy uniformed and civil services personnel engaged in comparable work. The term "direction" is defined as that process by which the OB/GYN physician receive technical guidance, direction and approval with regard to an element of work or a series of tasks within the requirements of this agreement.

62. The Statement of Work describes and delineates the Duties and Responsibilities of the physician in twenty-five consecutive paragraphs. These duties and responsibilities include items such as

---

**7.** Attachment A, paragraph 4 to the TRICARE contract provides that "[t]he statement of work is incorporated as Attachment C of this agreement and is provided by the MTF."

"[p]erform a full range of comprehensive OB/GYN services compatible with the medical treatment facility's operating capacity and equipment;" "perform the necessary therapeutic, diagnostic and prophylactic procedures for OB/GYN patients;" "prescribe medications as indicated and may dispense pre-packaged medications in accordance with policies and procedures of the MTF;" and that "all referrals, admissions, and duty excusals shall be conducted in accordance with policies and procedure of the MTF".

63. The identical Statement of Work is also attached and incorporated into Dr. Kushner's contract.

64. In addition, the TRICARE contract provides the following: "However, this does not preclude resource sharing personnel [physicians such as Dr. Kushner] from complying with directions received from MTF professional personnel [in this case, Naval Hospital of Jacksonville] in the course of patient care activities."

65. In addition, and particularly important to the facts of this case, is the Informed Consent for cesarean section form provided to Raiza Bravo on June 11, 2003, by Defendant United States, provides that Ms. Bravo consents to undergo an operation or procedure in which the healthcare provider will "make an incision in my abdomen and uterus (womb) to deliver my baby which is to be performed by or under the direction of Dr. *NAVAL HOSPITAL OF JACKSONVILLE STAFF* ".

66. Despite the clear, unequivocal language of the numerous contracts and the Informed Consent, Defendant United States argued that Dr. Kushner was an

independent contractor because the contractor was required to maintain Dr. Kushner's liability insurance, deduct his taxes, and could terminate his contract upon notice. The United States further argued that because it could not dictate the medical judgment of a physician, it necessarily lacked the "control" element necessary for a finding of FTCA liability under the "control test" set forth by the United States Supreme Court in *Logue v. Unites States*, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121; *United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976).[8] The United States attempts to explain away the plain language of these contracts by arguing that when the contract provides that "(Dr. Kushner's) physician activities shall be subject to day-to-day direction by Navy personnel in a manner comparable to the direction over Navy uniformed and civil service personnel engaged in comparable work" it doesn't mean what is says.

67. In addition to the authority to control established by the clear unambiguous language of the contracts, the Court notes that Dr. Kushner's hospital privileges were suspended by the Jacksonville Naval Hospital shortly after Kevin's birth.[9] The United States argues that this suspension fails to establish authority or power to control the detailed performance of the contractor. The Court disagrees.

## CONCLUSIONS OF LAW

### I. Burden of Proof

In any action for recovery of damages based on the death or personal injury of any person in which it is alleged that such death or injury resulted from the

---

8. "The critical factor…is the authority of the principal to control the detailed physical performance of the contractor." *Logue*, 412 U.S. 521, 93 S.Ct. 2215, 2219, 37 L.Ed.2d 121. *Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390.

9. Dr. Kushner testified that his hospital privileges were suspended by his commanding officer on July 20, 2003, which was nine days after Kevin's birth.

negligence of a health care provider as defined in s. 766.202(4), the claimant shall have the burden of proving by the greater weight of evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

Section 766.102(1), Florida Statutes.

█ The Court finds that Plaintiffs have met their burden of proving that Defendant United States' personnel, including Dr. Dwayne C. Clark, Dr. Ruben Del Pilar, Nurse Jennifer Trzaskus, Dr. Jacqueline Fignar, and Dr. Kenneth Kushner, fell below the prevailing professional standard of care by failing to timely deliver, or to ensure that an appropriate healthcare provider timely delivered, Kevin Bravo Rodriguez when the available medical information indicated that he was in danger. The Court further finds that this failure on the part of all personnel named above, all of whom were employees of the United States, to timely deliver or ensure that others timely deliver Kevin was the cause of his neurological injury and resulting damages, as well as the resulting damages to Kevin's parents, Raiza Bravo and Oscar Rodriguez.

## II. Multiple Tortfeasors Causing an Indivisible Injury

█ Two tenets of Florida substantive law are important on these facts.

First, under Florida law, an initial tortfeasor may be held responsible for all subsequent injuries, including those caused by medical negligence, even where the initial tortfeasor is a physician as well. *Caccavella v. Silverman*, 814 So.2d 1145 (Fla. 4th DCA 2002). Under *Caccavella*, Dr. Clark and Dr. Del Pilar, as the initial tortfeasors, are liable for all later injuries to Kevin, even though the later shift consisting of Dr. Kushner, Dr. Fignar and Nurse Trzaskus substantially contributed to causing or exacerbating those injuries. *See also Gross v. Lyons*, 763 So.2d 276 (Fla.2000) (answering a certified question in the affirmative and holding that initial tortfeasors are liable for all damages when the injury is indivisible).

█ Second, where two tortfeasors cause the same or similar injuries and it is difficult or impossible to apportion injuries between multiple tortfeasors, as the Court finds to be true in this case, defendants are subject to joint and several liability, even though their negligence is successive. *See Froats v. Baron*, 883 So.2d 885 (Fla. 5th DCA 2004).

Accordingly, the United States is fully liable for all damages suffered by Kevin Rodriguez and his parents given that the initial tortfeasors were indisputably military personnel. Moreover, the indivisible injury renders the United States jointly and severally liable for full damages even if Dr. Kushner were an independent contractor.[10]

## III. Independent Contractor Issue

"The Federal Tort Claims Act is a limited waiver of sovereign immunity, making

---

10. Although the Court's factual findings and conclusions of law on this point render a discussion of the independent contractor issue moot as to the liability of the United States, the Court nonetheless recognizes that Dr.

Kushner remains a named Defendant who is subject to having a judgment entered against him personally. For that reason, the Court analyzes Dr. Kushner's employee versus independent contractor status below.

the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans,* 425 U.S. 807, 813, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976); 28 U.S.C. § 1346(b). Section 1346(b) of Title 28 of the United States Code subjects the government to liability for

> ... injury or loss of property, personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

Section 2671 of Title 28 of the United States Code provides definitions for the Federal Tort Claims Act ("FTCA").

> 'Employee of the government' [is defined to include]: (1) officers or employees of any federal agency, members of the military or naval forces of the United States ... and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation....
>
> . . . . .
>
> 'Federal agency' includes ... corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.

28 U.S.C. § 2671.

In analyzing the "contractor" exception to the definition of "federal agency" under the FTCA, courts have utilized the common law distinction between the liability of an employer for the negligent acts of his own employees from his liability for the employees of a party with whom he contracts for a specified performance. *Logue v. United States,* 412 U.S. 521, 522–23, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). The Supreme Court concluded that the distinction "turn[s] on the absence of authority in the principal to control the physical conduct of the contractor in performance of the contract." *Id.* at 527, 93 S.Ct. 2215.[11]

■ Later, in *United States v. Orleans,* 425 U.S. 807, 814, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976), the Supreme Court refined the question to be "whether [the party's] day to day operations are supervised by the Federal Government."

> Applying principles of agency law, the [United States Supreme Court] in effect recognized that the term "federal agency'" is synonymous with "servant or agent" of the government. *See Logue,* 412 U.S. at 527–28, 93 S.Ct. at 2229–20 (citing Restatement (Second) of Agency § 2 (1958)); *Orleans,* 425 U.S. at 814–15, 96 S.Ct. at 1976.

*Leone v. United States,* 910 F.2d 46, 49 (2d Cir.1990). In so doing, the United States Supreme Court set forth the "control test," which looks to whether the government possessed the authority or power "to control the detailed physical performance of the contractor." *Logue,* 412 U.S. at 527, 528, 93 S.Ct. at 2219, 2220; *Orleans,* 425 U.S. at 814, 96 S.Ct. at 1976. Under this test, it does not matter whether the con-

---

**11.** Under the FTCA, it is irrelevant whether the physician contracted directly with the government or through a third party entity. *Linkous v. United States,* 142 F.3d 271, 277 (5th Cir.1998); *see also Sneed v. United States,* 29 F.3d 634 (9th Cir.1994). This is because the analysis for whether an individual is a statutory employee under the FTCA uses the "control test", and looks to the ability of the government to control the daily activities *of the individual.*

tract itself refers to the parties as "contractor." Rather, it is the level of control retained by the government to control the "contractor" in his day-to-day activities— that is, its *authority* or *power* to do so.[12]

## A. Plain Language of the Contract and Incorporated Documents

█ Under the plain contractual language of the instant case, Dr. Kushner was a statutory employee of the United States government for purposes of governmental liability under the FTCA when he provided care to Raiza Bravo and her unborn son on June 11, 2003. The Statement of Work sets forth, in no uncertain terms, that it is creating an "agency" relationship in which the medical services will be provided. Specifically, it reads as follows: "The services the OB/GYN physician shall provide will be rendered as a Resource Sharing Agreement with the Navy, *performing an agency function by providing direct medical care* required by the Navy for its health care beneficiaries." (emphasis supplied). For FTCA purposes, "agency" means "servant or agent of the federal government." *Leone*, 910 F.2d at 49, relying on *Logue* and *Orleans*.

In addition, the definition contained within the Statement of Work continues further, to provide for

> *day-to-day direction* [over Dr. Kushner] by Navy personnel in a manner comparable to the direction over Navy uniformed and civil service personnel engaged in comparable work. The term 'direction' is defined as that process by which the OB/GYN physician receives

technical guidance, direction and approval with regard to an element of work or a series of tasks within the requirements of this agreement.

(emphasis supplied). This day-to-day direction covered items including the procedures for prescribing medications, the procedures for writing duty excusals, and the requirement that the physician seek and attain approval from the military commander before introducing new medical procedures.

The contracts further provided that the physician was not precluded "from complying with directions received from military hospital professional personnel in the course of patient care activities." Despite the language in the TRICARE Contract and the Resource sharing Agreement attempting to shift control and supervision of the contract physicians to Humana, both documents nonetheless expressly reserved the right to direct the physicians supplied by Humana in the course of patient care activities. Very importantly, "direction" and "supervision" are synonyms. *Merriam Webster's Collegiate Dictionary* 328 (10th ed.) ("direction: 1. guidance or supervision of action or conduct: management"); *The American Heritage Dictionary* (2d. College Ed.)("direction: 1. The act or function of directing. 2. Management, supervision, or guidance of an action or operation."). The Government cannot shift liability while retaining control. The governing case law does not allow that to happen. With supervision, direction and

12. "The critical factor in determining whether an individual is an employee of the government or an independent contractor is the power of the federal government to control the detailed physical performance of the individual." *Linkous v. United States*, 142 F.3d 271, 275 (5th Cir.1998), citing *United States v. Orleans*, 425 U.S. 807, 814, 96 S.Ct. 1971, 1975–76, 48 L.Ed.2d 390; *Broussard v. United States*, 989 F.2d 171, 174 (5th Cir.1993); *Logue v. United States*, 412 U.S. 521, 527, 93 S.Ct. 2215, 2219, 37 L.Ed.2d 121. *See also Means v. United States*, 176 F.3d 1376, 1379–80 (11th Cir.1999). *Logue* used the language "authority" to control, 412 U.S. at 528, 93 S.Ct. at 2219–20, whereas *Orleans* used "power" to control. *Orleans*, 425 U.S. at 814, 96 S.Ct. at 1976.

control come responsibility. If the government insists on retaining the former, it is bound to accept the latter.

Moreover, the context in which the TRI-CARE contract and Resource Sharing Agreement refer to "supervision" and "control" provides that "these personnel are supervised or controlled by the contractor *for the purposes of directing the terms and conditions of employment.*" (emphasis supplied). Importantly, however, the case law looks to supervision and control of "day-to-day operations," not conditions of employment. *See Logue,* 412 U.S. at 529, 93 S.Ct. at 2220; *Orleans,* 425 U.S. at 815, 96 S.Ct. at 1976. The only place this language appears in any of the documents at issue is in the Statement of Work, which states that physician's activities shall be subject to the "day-to-day direction" of the Government when performing "work or a series of tasks within the requirements of this agreement."

While Defendant United States would ask this Court to believe that the "day-to-day direction by Navy personnel in a manner comparable to the direction over Navy uniformed and civil service personnel engaged in comparable work" refers to teaching Dr. Kushner how to send an email and use the phone system, such a contrived interpretation is not supportable by any reasonable reading of the plain language of the document. It would require the Court to ignore the preceding twenty-four paragraphs of the Statement of Work setting forth the numerous and varied duties and responsibilities of the physician while performing his obligations to the military hospital under the Statement of Work.

"[W]here the contractual language is clear, as it is in this case, a court will not look at extraneous testimony to determine the parties' intent." *Del Valle v. Sanchez,* 170 F.Supp.2d 1254, 1267 (S.D.Fla.2001),

relying on *In re Yates Dev., Inc.,* 256 F.3d 1285, 1289 (11th Cir.2001).

Importantly, not only did the Government reserve the right to control Dr. Kushner, it actually did so. His commanding officer suspended Dr. Kushner's hospital privileges on June 20, 2003—nine days after Kevin Bravo Rodriguez was born. Section 395.0193 of the Florida Statutes, "Licensed Facilities: peer review; disciplinary powers; agency or partnership with physicians" directly refutes this argument. Section 395.0193(3) provides the following:

If reasonable belief exists that conduct by a staff member or physician who delivers health care services at the licensed facility may constitute one or more grounds for discipline as provided in this subsection, a peer review panel *shall investigate and determine whether grounds for discipline exist* with respect to such staff member or physician. The governing board of any licensed facility, after considering the recommendations of its peer review panel, *shall suspend, deny, revoke, or curtail the privileges,* or reprimand, counsel, or require education, of any such staff member or physician after a final determination has been made that one or more of the following grounds exist . . .

§ 395.0193(3), Fla. Stat. (emphasis supplied).

Dr. Kushner testified that his commanding officer took "punitive disciplinary action" against him nine days after Kevin's birth. The Florida Statute governing the available avenues for disciplining a physician during a peer review process includes the suspension of privileges as a form of discipline. Dr. Kushner's factual testimony and Florida statutory definitions on the specific topic are competent evidence that the military hospital had the power to, and in fact did, discipline Dr. Kushner. The

Court finds that the suspension of privileges was just as Dr. Kushner testified: punitive action taken against him by his Commanding Officer.

As Plaintiffs have argued from the outset, under the plain language of the subject contracts, the legal definition of an employee for Federal Tort Claims Act purposes is literally grafted into the contract, to which the United States government is contractually bound. The contract defines the relationship as one of "agency" for "providing direct medical care"; the contract provides not only for day-to-day direction, but further confirms that this direction entails guidance, direction *and approval* of the physician's work or tasks; the contract requires prior approval of medical care and treatment procedures; the contract requires Dr. Kushner to comply with directions received from MTF professional personnel in the course of patient care activities. The directions given by military *professional* personnel *in the course of patient care activities* refers to medical care, not to clerical proficiency with the email system. Defendant United States' argument throughout its papers that the Government controlled only administrative aspects of Dr. Kushner's work is belied by the plain language of the Statement of Work, TRICARE contract and Resource Sharing Agreement. Having selected, approved, and included this language, Defendant United States is bound by its plain meaning.

None of the circuit court decisions relied upon by Defendant United States involves a contractual provision remotely similar to the clause contained in the Naval Hospital's Statement of Work, which allowed for the government to provide day-to-day direction of Dr. Kushner in a manner comparable to Navy employees. Instead, quite opposite from the present case, those decisions involved contracts in which the government expressly relinquished any right to direct, control, or supervise the contract physicians.

Further and as this Court most respectfully observed at trial, the analysis of many of the circuit decisions are flawed since asking the wrong question inevitably produces the wrong answer.

Rather than focusing on "the critical factor," to wit: "...the authority to control the physical conduct of the contractor," much time is spent in examining such quibbles as who pays social security tax, etc.

Very often this type of analysis results in not being able to see the forest for the trees.

While a consideration of these many factors is not inappropriate, they must yield to the clear unambiguous language of the contract which in this case clearly establishes the *authority* of the United States to control the physical conduct of Dr. Kushner—and which authority they clearly exercised.

The United States cannot escape liability for the actions of one over whose activities it exercises direct day-to-day control by simply denominating him "an independent contractor."

If the United States has the authority ("power") to control the physical day-to-day conduct of an individual, that individual under *Logue* is an *employee*—not an independent contractor.

In the case of the United States—"If the Boss is Me—He's My Employee."

The Court finds, as a matter of law, that Dr. Kushner was an employee of the United States government for FTCA purposes during the time he rendered care to Raiza Bravo during her labor and delivery with Kevin.

## IV. Bankruptcy

The Court, after listening to the evidence, reviewing the record, and evaluating the credibility of Mr. Rodriguez, finds that Mr. Rodriguez's failure to disclosure his derivative claim for his son's injury was unintentional. The Court finds persuasive that the nondisclosure was based on a reasonable misunderstanding by Mr. Rodriguez of the role the *Feres* doctrine played in his ability to personally sue the military. The Court's finding is further supported by the fact that no reasonable person would jeopardize a potentially multi-million dollar claim to defraud creditors out of $30,000.00. Accordingly, Mr. Rodriguez is entitled to recover the full amount of his claim, less the amount the trustee determines is due to his creditors, if any.

## V. Summary

1. In summary, the Court finds that Plaintiffs have met their burden of proving that the Defendant Untied State's personnel, including Dr. Dwayne Clark, Dr. Rubin del Pilar, Nurse Jennifer Trzaskus, Dr. Jacqueline Fignar and Dr. Kenneth Kushner, jointly and severally, failed to meet the standard of care by failing to timely deliver, or to ensure that an appropriate healthcare provider timely delivered, Kevin Bravo Rodriguez when the available medical information indicated that he was in danger. The Court further finds that this failure to timely deliver Kevin was the cause of his neurological injury resulting in damages, as well as the resulting damages to Kevin's parents, Raiza Bravo and Oscar Rodriguez. Had any one of these health care professionals met the standard of care required by their respective professions during Mrs. Bravo's labor and confinement, the injury complained of would—within a reasonable degree of probability—not have occurred.

2. The Defendants just named acted in concert, but also performed or failed to perform separate independent acts, all of which, and each of which, combined to produce a single catastrophic injury, which injury was proximately caused by the conduct of the Defendants, both individually and collectively.

3. The injury in this case is indivisible. The negligence of the defendants is indivisible since the individual action or inaction of each defendant was a substantial factor in bringing about this catastrophic injury. There is no rational means available to this trier of fact to apportion fault.

4. In this case two or more causes combined to produce the injury suffered by Kevin Rodriguez, which injury is incapable of division on any logical or reasonable basis. Each independent cause was a substantial factor in bringing about the harm, and each cause proximately contributed to the harm complained of.

In other words, the tortious conduct of the employees of the Defendant United States of America substantially contributed to and was the proximate cause of the indivisible injury suffered by Kevin Rodriguez.

5. The indivisible injury rule will be applied in this case. Hence each Defendant is individually and collectively responsible for the entire consequence of their acts.

## VI. Damages

Under Florida substantive law, if the greater weight of the evidence shows that the negligence of Defendant injured their son, Plaintiffs are entitled to recover the following elements:

1. any bodily injury sustained by Kevin Bravo Rodriguez, and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, in-

convenience, and loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future. Florida Standard Jury Instruction 6.2(a);

2. any earnings lost in the past and any loss of ability to earn money in the future, as well as any loss of ability to earn money sustained in the past and any such loss in the future. Florida Standard Jury Instruction 6.2(d);

3. the reasonable value or expense of hospitalization and medical and nursing care and treatment necessarily or reasonably obtained by Raiza Bravo or Oscar Rodriguez, for their son Kevin Bravo Rodriguez, in the past or to be so obtained in the future. Florida Standard Jury Instruction 6.2(f);

4. any loss by Raiza Bravo and Oscar Rodriguez, by reason of the injury to their son, Kevin, of his companionship, society, love, affection, and solace in the past and in the future. Florida Standard Jury Instruction 6.2(f); *see also Cruz v. Broward County School Board,* 800 So.2d 213 (Fla. 2001).

5. any indirect economic losses by Raiza Bravo and Oscar Rodriguez, by reason of the injury to their son, Kevin, such as income lost by either parent in caring for the child. *Yordon v. Savage,* 279 So.2d 844, 846 (Fla.1973).

The Court has found that the negligence of Defendant's personnel injured Kevin. The Court now turns to evaluating the elements of damage for which Plaintiffs are entitled to be compensated.

Plaintiffs' Vocational Rehabilitation expert, Larry Foreman testified that Kevin will need extensive medical care, therapy and will incur extraordinary expenses related to his injury throughout life. Kevin's treating physicians at Miami Children's Hospital, as well as Plaintiffs' pediatric neurology expert from the Medical University of South Carolina, agreed that Kevin will need the items set forth in Mr. Foreman's life care plan for the durations specified. Kevin's treating physicians testified that Kevin will live to be at least twenty-one years of ago.

Although Defendant presented testimony of a pediatric neurologist that Kevin would not live past the age of ten, the Court rejects that testimony as being in direct contradiction of the testimony and personal experience of Kevin's personal, treating physicians who specialize in treating children such as Kevin at Miami Children's Hospital. The Court finds the treating physicians and Plaintiffs' expert to be more credible on this issue, and accordingly provides for economic damages to cover Kevin's necessary expenses through 21 years of age only—although he may well live much longer.

Based on Mr. Foreman's life care plan, Plaintiffs' economist, Dr. Williams, testified. that Plaintiffs' will incur the following economic damages: Kevin's Lost Earning Capacity $2,252,838; Future Medical Expenses $8,935,290; Past Medical Expenses $325,520; Loss of Earning Capacity for Raiza Bravo $1,207,766, for total economic damages of $12,793,109.[13]

---

13. Dr. Williams testified that the past medical expenses "billed" were $893,613, of which only $325,520 were paid. The remaining $573,093 had been discharged or "written off" by the healthcare providers after receiving contract payments from Tricare or Medicaid. The parties agree that Florida law requires a set-off for the $573,093 that was written off. *Goble v. Frohman,* 901 So.2d 830 (Fla.2005). In addition, the parties agree that the federal government cannot assert a lien against itself for the Tricare payments. 42 U.S.C. §§ 2651 et seq. and 10 U.S.C. § 1095. In light of the Court's ruling that Defendant Kushner is an employee of the United States of America, and therefore individually im-

The Court, having reviewed the evidence, awards the following economic damages: Kevin's Lost Earning Capacity $1,973,112; Future Medical Expenses $7,809,769; Past Medical Expenses $99,024.98; Loss of Earning Capacity for Raiza Bravo $603,883, for total economic damages of $10,485,789.

 The Court now turns to the task of awarding non-economic damages to Plaintiffs for Kevin's past and future mental anguish, pain and suffering, inconvenience, and loss of capacity for the enjoyment of life, and to his parents for their loss of Kevin's companionship, society, love, affection, and solace.[14] The Court notes that Kevin has been robbed of the life to which he was entitled, while his parents have been robbed of the son, and the relationship with their son, to which they were entitled. No one in the case disputed the magnitude of Kevin's injury, or the magnitude of the impact it has had on all of their lives. Everyone agreed Kevin's parents remain devoted to providing Kevin with the most loving and supportive environment possible, at great sacrifice to themselves. Florida law provides compensation for these losses.

Cases with injuries such as this involve extensive economic damages and, naturally, devastating mental anguish and pain and suffering as well. While there is no exact standard or measurement for awarding non-economic damages to Plaintiffs in this case, the Court finds the following amounts to be fair and just in light of the evidence:

For any bodily injury sustained by Kevin Bravo Rodriguez, and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future, the Court awards $10,000,000.00.

For any loss by Raiza Bravo, by reason of the injury to her son, Kevin, of his companionship, society, love, affection, and solace, the Court awards $25,000,000.00.

For any loss by Oscar Rodriguez, by reason of the injury to his son, Kevin, of his companionship, society, love, affection, and solace, the Court awards $15,000,000.00.

### ORDER

Based upon the law, evidence and testimony presented and duly considered by the Court, it is hereby Ordered and Adjudged as follows:

1. That Final Judgment be entered on behalf of the Plaintiffs and against the Defendant, United States of America.

2. That the Rule 52 motion of the defendant Dr. Kushner made at the close of all the evidence be and the same is hereby granted and Dr. Kushner shall stand dismissed as a party defendant in this case

3. That Plaintiff's counsel shall submit a proposed form of Final Judgment for entry herein as required by Rule 58 within seven days.

---

mune from suit under the Federal Tort Claims Act, only the amount of the Medicaid lien for past payments is recoverable against Defendant United States of America. That amount is $99,024.98. No set-off for future payments is permitted under Florida law. *Allstate v. Rudnick,* 761 So.2d 289 (Fla.2000)(interpreting § 768.76, Fla. Stat.)

**14.** Florida law provides that loss of parental filial consortium is available only for the period until Kevin attains majority. *Cruz v. Broward County School Board,* 800 So.2d 213 (Fla.2001).